No. 25-4843

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ANDREA BARTZ, CHARLES GRAEBER, and KIRK WALLACE JOHNSON,

PLAINTIFFS-RESPONDENTS,

v.

ANTHROPIC, PBC,

DEFENDANT-PETITIONER.

On Petition for Permission to Appeal from the United States District Court
for the Northern District of California
Case No. 3:24-cv-05417-WHA
The Honorable William H. Alsup

**BRIEF OF AMICI CURIAE AUTHORS ALLIANCE, ELECTRONIC FRONTIER FOUNDATION, ASSOCIATION OF RESEARCH LIBRARIES, AMERICAN LIBRARY ASSOCIATION, AND PUBLIC KNOWLEDGE IN SUPPORT OF DEFENDANT-PETITIONER'S PETITION FOR PERMISSION TO APPEAL UNDER RULE 23(F)**

Mitchell L. Stoltz
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Email: mitch@eff.org
Telephone: (415) 436-9333
Fax:  (415) 436-9993

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amici state that they do not have a parent corporation and that no publicly held corporation owns 10% or more of their stock.

Dated: August 7, 2025                     By:  /s/ *Mitchell L. Stoltz*
                                                               Mitchell L. Stoltz

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF CONTENTS ................................................................................... ii

TABLE OF AUTHORITIES .............................................................................. iii

INTEREST OF AMICI ....................................................................................... 1

ARGUMENT ..................................................................................................... 2

    I.    Without Prompt Appeal, Important Questions About Commonality That Are Endemic to Copyright Class Actions Will Evade Review. ... 4

    II.   The District Court Erred in Failing to Assess the Characteristics of the Class in Its Adequacy and Typicality Determinations ........................ 10

CERTIFICATE OF COMPLIANCE ................................................................. 13

CERTIFICATE OF SERVICE ......................................................................... 14

# TABLE OF AUTHORITIES
**Cases**

*Amchem Prods. Inc. v. Windsor*,
  521 U.S. 591 (1997) .................................................................................10

*Aquarian Found., Inc. v. Lowndes*,
  127 F.4th 817 (9th Cir. 2025) .....................................................................5

*Authors Guild et al. v. Google, Inc.*,
  No. 05-8136 (S.D.N.Y. March 22, 2011) ...................................................7

*Authors Guild, Inc. v. Google, Inc.*,
  721 F. 3d 132 (2nd Cir. 2013) ...................................................................11

*Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*,
  222 F.3d 52 (2d Cir. 2000) ........................................................................10

*Cambridge Univ. Press v. Becker*,
  863 F. Supp. 2d 1190 (N.D. Ga. 2012) .......................................................6

*Chamberlan v. Ford Motor Co.*,
  402 F.3d 952 (9th Cir. 2005) ......................................................................3

*Gen. Tel. Co. of Sw. v. Falcon*,
  457 U.S. 147 (1982) ...................................................................................3

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.*,
  153 F.3d 82 (2d Cir. 1998) ........................................................................8

*Random House, Inc. v. Rosetta Books LLC*,
  283 F.3d 490 (2d Cir. 2002) ......................................................................8

*Schneider v. YouTube, LLC*,
  674 F. Supp. 3d 704 (N.D. Cal. 2023) ....................................................5, 9

*Waite v. UMG Recordings, Inc.*,
  No. 1:2019-cv-01091, 2023 WL 1069690 (S.D.N.Y. Jan. 27, 2023) ..........5

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ...................................................................................4

**Statutes**

17 U.S.C. § 410 .................................................................................................5

17 U.S.C. § 501 .................................................................................................5

**Rules**

Fed. R. Civ. Pro. 23 ...................................................................................4, 10

**Legislative Materials**

Orphan Works Act of 2008, H.R. 5889, 110th Cong. (2008) ...................................6

Shawn Bentley Orphan Works Act of 2008, S. 2913, 110th Cong. (2008) .............6

**Other Authorities**

Andrew Albanese & Jim Milliot, *Agents, Authors Question HarperCollins AI Deal*, Publishers Weekly (Nov. 19, 2024) .........................................................8

Authors Alliance, *Authors Speak Out: an Update on the Wiley ebook Situation* (Oct 14, 2022) .................................................................................11

Chris Woolston, *US Faculty Members Support Open-Access Publishing in Broad Survey*, Nature (July 28, 2022) ...............................................10

Creative Commons, *About CC Licenses* .................................................................9

Robert Brauneis, *Copyright and the World's Most Popular Song*, 56 J. Copyright Soc'y U.S.A. (2009)...................................................................5

The Authors Guild, *Final Summary Notice of Class Action* (2008)..........................7

U.S. Copyright Off., *Orphan Works and Mass Digitization* (2015) ........................6

U.S. Copyright Off., *Report on Orphan Works* (2006) ............................................6

## INTEREST OF AMICI[1]

Authors Alliance is a 501(c)(3) nonprofit that seeks to advance the interests of authors who want to serve the public good by sharing their creations broadly. Authors Alliance has over 3,000 members, including Nobel laureates, MacArthur fellows, novelists, historians, fan fiction writers, journalists, and others. We have an interest in this case because it has profound implications for how authors' works are used for training large language models, a transformative technology that will enhance creativity, advance research and learning, and expand access to knowledge. Authors Alliance has also supported authors who are engaged in text data mining and AI research, relying on the very same legal defenses that Anthropic has asserted in this case. Many Authors Alliance members are likely members of this class. We have a particular interest in ensuring that the views of those authors who are supportive of fair use, open access, and wide dissemination and use of their works are not co-opted by rightsholders who have opposing views.

The Electronic Frontier Foundation ("EFF") is a nonprofit civil liberties organization with over 33,000 dues-paying members that works to protect consumer

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), amici hereby state that none of the parties to this case nor their counsel authored this brief in whole or in part; no party or any party's counsel contributed money intended to fund preparing or submitting the brief; and no one else other than amici, their members, and their counsel contributed money that was intended to fund preparing or submitting this brief. All parties have consented to this filing.

1

interests, innovation, and free expression in the digital world. EFF has a strong interest in ensuring that copyright fulfills its purpose of promoting progress, serving the interests of creators, innovators, and the public.

The American Library Association and the Association of Research Libraries represent the interests of over 100,000 libraries employing more than 250,000 librarians and other personnel. Libraries have experienced the significant challenges of identifying the current copyright owners of the works in their collections for mass digitization projects.

Public Knowledge is a nonprofit organization that is dedicated to preserving the openness of the Internet and the public's access to knowledge, promoting creativity through balanced intellectual property rights, and upholding and protecting the rights of consumers to use innovative technology lawfully.

## ARGUMENT

This case is of exceptional importance, addressing the legality of using copyrighted works for generative artificial intelligence ("AI"), a transformative technology used by hundreds of millions of researchers, authors, and others. The district court's rushed decision to certify the class represents a "death knell" scenario that will mean important issues affecting the rights of millions of authors with respect to AI will never be adequately resolved. With tens of billions of dollars in statutory damages in play, Anthropic will likely be "forced…to settle rather than

2

incur the costs of defending a class action and run the risk of potentially ruinous liability," *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 957 (9th Cir. 2005) (cleaned up)).

Leaving this class certification in place would also mean "an unsettled and fundamental issue of law relating to class actions…is likely to evade end-of-the-case review"—specifically, whether a proposed class of rightsholders with such diversity of interests can satisfy Rule 23's commonality requirement. *Id.* at 959.

Astonishingly, the district court certified this class with almost no meaningful inquiry into who the actual members are likely to be. The court did no analysis of what types of books are included in the class, who authored them, what kinds of licenses are likely to apply to those works, what the rightsholders' interests might be, or whether they are likely to support the class representatives' positions. The district court fell far short of the "rigorous analysis" that trial courts must undertake under Rule 23(a). *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982).

Had the district court conducted such an analysis, it would have uncovered decades of research, multiple bills in Congress, and numerous studies from the U.S. Copyright Office attempting to address the challenges of determining rights across a vast number of books. It would have revealed how the complexity of years of publishing contracts makes ownership determinations fraught and prone to conflict. It also would have shown that rightsholders have genuine and significant differences

3

of opinion about the legality of AI and the specific uses Anthropic has engaged in. There is no realistic pathway to resolving these issues in a common way as Rule 23(a) requires. Had the court conducted the rigorous analysis required it would have also seen that a wide diversity of authors, publishers, and rightsholders now find themselves represented by three writers whose interests are antagonistic to their own. It is precisely this scenario that Rule 23(f) is meant to avoid, and so this Court should grant Anthropic's petition for appeal.

I. **Without Prompt Appeal, Important Questions About Commonality That Are Endemic to Copyright Class Actions Will Evade Review.**

This case presents important, unresolved questions about whether a copyright suit that covers such a broad and diverse set of works can satisfy Rule 23's commonality requirement. Rule 23 requires that "there are questions of law or fact common to the class." Fed. R. Civ. Pro. 23(a)(2). The claims

> must depend upon a common contention…of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke. "What matters to class certification…is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers."

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (citations omitted).

There are several challenges to establishing commonality in suits such as this. The first is that proof of a valid copyright and copyright ownership are required. 17

4

U.S.C. § 501(b). Common proof will not suffice to determine ownership in complex scenarios, including joint authorship or books where each chapter is separately authored. It will also fail to address exclusivity, assigned rights, and terminated assignments. These require individualized inquiry. Courts have refused class certification when determining ownership requires individualized proof. *See Schneider v. YouTube, LLC*, 674 F. Supp. 3d 704, 722–23 (N.D. Cal. 2023) (denying class certification due to lack of evidence of common questions regarding ownership and infringement); *Waite v. UMG Recordings, Inc.*, No. 1:2019-cv-01091, 2023 WL 1069690, at *10 & n.85 (S.D.N.Y. Jan. 27, 2023) (citation omitted) (denying class certification when some works may have been work made for hire so that ownership was unclear).

Plaintiffs attempted to sidestep these concerns by limiting the class to owners of works registered with the U.S. Copyright Office. Registration creates a presumption of validity of the facts in the registration certificate, including ownership. 17 U.S.C. § 410(c). But this presumption is rebuttable and, in many cases, may require extensive discovery and trial on factual issues. *See Aquarian Found., Inc. v. Lowndes*, 127 F.4th 817, 819 (9th Cir. 2025). Even for some of the best known works with well-documented histories, determining copyright validity and ownership has been agonizingly difficult. *See, e.g.*, Robert Brauneis, *Copyright and the World's Most Popular Song*, 56 J. Copyright Soc'y U.S.A. 335 (2009)

5

(reporting on over 200 unpublished documents from six archives related to copyright ownership of the song "Happy Birthday to You").

Beyond the issue of validity, publishers and authors who claim to be the copyright holder of a work may not be. Determining ownership requires evaluating evidence unique to each author and their publishing contract. In many cases, documentation regarding ownership is lost over time, requiring extensive factfinding. *See Cambridge Univ. Press v. Becker*, 863 F. Supp. 2d 1190, 1222–23 (N.D. Ga. 2012).

In other cases, even identifying rightsholders to address ownership questions will be impossible. For decades authors, publishers, and librarians have grappled with how to legally reuse books with difficult-to-reach copyright owners. So-called "orphan works" have been the subject of extensive study. Congress has considered multiple bills. *See* Orphan Works Act of 2008, H.R. 5889, 110th Cong. (2008); Shawn Bentley Orphan Works Act of 2008, S. 2913, 110th Cong. (2008). The Copyright Office has also conducted years of studies on the issue, including in the context of mass digital uses. *See* U.S. Copyright Off., *Report on Orphan Works* (2006), https://perma.cc/3LZ4-Z4R4; U.S. Copyright Off., *Orphan Works and Mass Digitization* (2015), https://perma.cc/V5ZC-CS2M. In the Google Books litigation (concerning a mass digital corpus of books), Google and the settling plaintiffs concluded that it would cost Google $34.5 million to set up a "Books Rights

6

Registry" to identify owners for payouts under the proposed settlement. *See* The Authors Guild, *Final Summary Notice of Class Action* (2008), https://perma.cc/Y3JW-6MBX.[2] Here, the district court addressed none of this complexity, apparently content that "a rigorous notice process," Pet. for Permission to Appeal Under Rule 23(f) Ex. A ("CC Order") at 10, will somehow resolve a problem that no one in the publishing industry has been able to figure out after decades of work.

The complexity of determining both validity and ownership of copyrights is also likely to generate significant confusion and disputes among potential rightsholders, particularly between legal owners (often publishers) and beneficial owners (often authors). Potential recoveries of up to $150,000 per work mean such disputes will not be trivial. The district court brushed these concerns aside, first by stating that "because authors and publishers are in business together and will work out the best way to recover," and second by creating a notification scheme that would require class claimants to themselves notify other potential rightsholders. CC Order at 12.

---

[2] The court ultimately rejected the settlement, largely because many class members opposed it, underscoring the diversity of interests of book authors with respect to technological uses of their works. *Authors Guild et al. v. Google, Inc.*, no. 05-8136 (S.D.N.Y. March 22, 2011), https://perma.cc/BEL2-WD2V.

7

The district court vastly underestimated the potential for dispute and the challenge of resolving such disputes. Anthropic's petition rightly notes that publishing contracts are likely to have ambiguous clauses about ownership or the rights at issue here. This is particularly true for older works covered under publishing contracts that did not contemplate digital uses. *See Random House, Inc. v. Rosetta Books LLC*, 283 F.3d 490, 491–92 (2d Cir. 2002). The court also ignored the complexity of determining ownership of foreign works, which is ordinarily dependent on foreign law. *See Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 90 (2d Cir. 1998). Authors and publishers are already at odds over AI, and these ambiguities are bound to foster dispute. *See* Andrew Albanese & Jim Milliot, *Agents, Authors Question HarperCollins AI Deal*, Publishers Weekly (Nov. 19, 2024), https://perma.cc/Z45Z-NYZT. Moreover, many authors, including many Authors Alliance members, are likely to have sharp disagreements with their publishers about the very basis of the suit, both because they use AI tools like Anthropic's and because they rely on fair use in a similar manner to Anthropic for their own research. The district court's proposed resolution would likely require hundreds of mini-trials to sort out these issues.

Finally, there are unlikely to be common questions capable of classwide resolution as to Anthropic's defenses, such as fair use or license. "Every copyright claim is also subject to defenses that require their own individualized inquiries."

8

*Schneider*, 674 F. Supp. 3d at 717. Many authors intentionally share their work under open licenses such as Creative Commons licenses to encourage reuse. Creative Commons, *About CC Licenses*, https://perma.cc/92QJ-PJF3.[3] Anthropic, like any user of those permissively licensed works, should be entitled to present a license defense for such works.

The district court gives no explanation for what will be done with authors who are dead and whose literary estates hold rights split across multiple parties; how now-defunct publishers will be addressed; how the large number of foreign rightsholders who are now included in this class will be reached or how the collectives that manage their works will be integrated into such a process; or how rightsholders that hold exclusive rights in portions of books (*e.g.*, chapters, images, or other inserts) will be addressed. Across a corpus of 7 million books, these issues are likely to be rampant. In attempting to resolve the rights issues accurately, the court will confront the impossibility of actually tracking down these rightsholders, much less getting them to meaningfully engage with this suit (*e.g.*, by sending out their own notices to co-authors or others who the author knows may have an interest in the work).

---

[3] Many academic presses make some or most of their books available under open licenses, including MIT, University of Michigan, University of California, Penn State, Oxford, and Cambridge.

9

## II. The District Court Erred in Failing to Assess the Characteristics of the Class in Its Adequacy and Typicality Determinations.

Rule 23(a)(4) requires that representative plaintiffs fairly and adequately represent the interest of all class members. Adequacy "entails inquiry as to whether …plaintiff's interests are antagonistic to the interest of other members of the class." *Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000). The focus of the inquiry is on uncovering "conflicts of interest between named parties and the class they seek to represent." *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

In this case, the district court did essentially no assessment of the actual works included in the class, and therefore no meaningful inquiry into the interests of the class itself. In fact, deep conflicts exist between class representatives that seek to halt Anthropic's AI work and extract statutory damages from it, and authors in the class who support Anthropic's uses.

Academic authors, for instance, have very different motivations for writing than those creating entertainment products. Many view the widespread dissemination and use of their works to be highly desirable, and seek to lower barriers to reuse, including through AI. *See* Chris Woolston, *US Faculty Members Support Open-Access Publishing in Broad Survey*, Nature (July 28, 2022), https://perma.cc/29PL-XQSY. Many authors have taken issue with their publishers' attempts to restrict access to and use of their books. *See* Authors Alliance, *Authors*

10

*Speak Out: an Update on the Wiley ebook Situation* (Oct 14, 2022), https://perma.cc/CHD4-TPZ2.

It was these kinds of concerns that gave the Second Circuit pause when reviewing class certification in the Google Books litigation, a case covering some 12 million books largely sourced from academic libraries. In Google Books, a small group of popular book authors sought to represent a class that included a large number of academic authors. Google's adequacy concern was one which the panel believed "may carry some force," motivating in part the court's remand for further consideration. *Authors Guild, Inc. v. Google, Inc.*, 721 F. 3d 132, 134 (2nd Cir. 2013)*.*

Here, the district court simplistically dismissed Anthropic's adequacy argument: "Whoever would like Anthropic to take their books for free can achieve that result even if the remaining class prevails: They can opt out and license their works to Anthropic or to all the world for nothing." CC Order at 11. This resolution—that authors can simply "opt out"—is an inadequate answer to a fundamental fairness problem in the formulation of the class and the due process concerns of absent class members. Many of those class members are unlikely to ever hear about the suit given the difficulties in identifying and notifying them.

11

These fundamental problems preclude a fair consideration of many class members' rights, which are also unlikely to reach a final determination absent this Court's stepping in now.

Respectfully submitted,

Dated: August 7, 2025

By: /s/ *Mitchell L. Stoltz*
    Mitchell L. Stoltz

ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone: (415) 436-9333
Fax: (415) 436-9993
mitch@eff.org

*Counsel for Amici Curiae*

12

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify as follows:

1.    This Brief of Amici Curiae Authors Alliance, Electronic Frontier Foundation, Association of Research Libraries, American Library Association, and Public Knowledge in Support of Defendant-Petitioner's Petition for Permission to Appeal under Rule 23(F) with the type-volume limitation of Ninth Circuit Rules 5-2(b) and 32-3, and Federal Rule of Appellate Procedure 29(a)(5) because this brief contains 2,615 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365, the word processing system used to prepare the brief, in 14-point font in Times New Roman font.

Dated: August 7, 2025          By: /s/ *Mitchell Stoltz*
                                                       Mitchell Stoltz
                                                       *Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system on August 7, 2025.

I certify that all participants in the case are registered ACMS users and that service will be accomplished by the appellate ACMS system.

Dated: August 7, 2025            By: /s/ *Mitchell Stoltz*
                                                    Mitchell Stoltz
                                                    *Counsel for Amici Curiae*