No. 25-4843

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

ANDREA BARTZ, ANDREA BARTZ
INC., CHARLES GRAEBER, KIRK
WALLACE JOHNSON, and MJ + KJ INC.,

*Plaintiffs-Respondents*,

v.

ANTHROPIC PBC,

*Defendant-Petitioner*.

On Petition from the United States District Court
for the Northern District of California
Case No. 3:24-cv-05417-WHA
Hon. William H. Alsup

---

**BRIEF OF FOUNDATION FOR AMERICAN INNOVATION AS AMICUS
CURIAE SUPPORTING PETITIONERS AND RULE 23(f) LEAVE TO
APPEAL**

---

Tim Hwang
Foundation for American Innovation
2443 Fillmore St #380-3386
San Francisco, CA, 94115
Telephone: (973)-960-4955
tim.hwang@thefai.org

*Counsel for Amicus Curae*

August 7, 2025

**CORPORATE DISCLOSURE STATEMENT**

The Foundation for American Innovation (FAI) is a nonprofit corporation

organized under Section 501(c)(3) of the Internal Revenue Code. FAI has no

parent company and issues no stock. No publicly held company owns an interest of

ten percent or more in FAI.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................... iii

IDENTITY AND INTEREST OF AMICUS CURIAE ............................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................ 2

ARGUMENT ....................................................................................... 5

   I.   PREDOMINANCE IS ABSENT, AND NOTICE SUFFERS THE SAME RULE 23(B)(3) MANAGEABILITY DEFECT ................................................ 5

   II.   RUINOUS STATUTORY DAMAGES RISK MAKES CLASS CERTIFICATION UNSUSTAINABLE AND THREATENS INVESTMENT, OPEN SOURCE, AND NATIONAL SECURITY ........................................... 7

CONCLUSION .................................................................................. 12

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Authors Guild v. Google,*
  721 F.3d 132 (2d Cir. 2013) ................................................................9

*Amchem Prods, Inc. v. Windsor*,
  521 U.S. 591 (1997) ...........................................................................6

*Am. Geophysical Union v. Texaco Inc.*,
  60 F.3d 913 (2d Cir. 1994) ................................................................6

*Blair v. Equifax Check Servs.*, Inc.,
  181 F.3d 832 (11th Cir. 1999) ..........................................................8

*Chamberlan v. Ford Motor Co.*,
  402 F.3d 952 (9th Cir. 2005) .....................................................4, 8, 9

*In re Lorazepam*,
  289 F.3d 98 (D.C. Cir. 2002) ............................................................9

*In re Napster, Inc. Copyright Litig.*, No. 310 O 227/23,
  2005 WL 1287611 (N.D. Cal. June 1, 2005) .....................................7

*Kneschke v. LAION e.V.*,
  No. C MDL-00-1369 MHP, (LG Hamburg Sept. 27, 2024) .............11

*MGM v. Grokster*,
  545 U.S. 913 (2005) .........................................................................10

*Van v. LLR, Inc.*,
  61 F.4th 1053 (9th Cir. 2023) ...........................................................7

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ...........................................................................6

**STATUTES**

17 U.S.C. § 107(2), (4) (2018) ................................................................5

17 U.S.C. § 504(c)(2) ..............................................................................7

**RULES**

Fed. R. Civ. P. 23 ..............................................................................3, 7

**OTHER AUTHORITIES**

*An Empirical Study of Class Action Settlements and Their Fee Awards*,
   7 J. Empirical Legal Stud. 811 (2010)..................................................8

*CDAO Announces Partnerships with Frontier AI Companies to Address National
   Security Mission Areas*
   Chief Digital and Artificial Intelligence Office (2025)......................11

*Copyright and Innovation: The Untold Story*,
   2012 Wis. L. Rev. 891 (2012) ...........................................................10

*Copyright-Exempt Nonprofits: A Simple Proposal to Spur Innovation*,
   45 Ariz. St. L.J. 1433 (2013) .............................................................10

*Data and Artificial Intelligence FY 2025 Strategic Action Plan,*
   U.S. Space Force (2025) ....................................................................11

*Final Report*,
   Nat'l Sec. Comm'n on Artificial Intelligence (2021) .........................11

*MoneyTree Report (Thomson Reuters data),*
   PricewaterhouseCoopers & Nat'l Venture Cap. Ass'n (2015) .............10

*Open Source Technology in the Age of AI*,
   McKinsey & Co. (2025) .....................................................................10

*Statutory Damages Under the Copyright Act: An Empirical Study*,
   2022 Mich. St. L. Rev. 1179 (2022).....................................................8

*Studying Civil Litigation Through the Class Action*,
   62 Ind. L.J. 497 (1987) ........................................................................8

## IDENTITY AND INTEREST OF AMICUS CURIAE[1]

The Foundation for American Innovation (FAI) is a 501(c)(3) nonprofit organization. Its mission is to develop technology, talent, and ideas that support a better, freer, and more abundant future. Its employees conduct this work by helping policymakers play a more productive role in fostering innovation, helping technologists and founders take a more active role in shaping governance, and informing the public of how such collaboration is vital to the continued success of the American project.

FAI joins this case because the district court's order erroneously certifies a class sweeping in up to seven million books—the largest copyright class action in history. That blanket threat would bury young firms under per-use damages and drive away the capital they need. Founders would be forced to pay lawyers before writing code.

Beyond practical considerations, FAI writes because we believe it is best practice for courts to apply the law to new technologies carefully, after development of a full record, across varied relevant cases—application this order

---

[1] No party's counsel authored any part of this brief. No one, apart from FAI and its counsel, contributed money intended to fund this brief's preparation or submission. Special thanks to Joshua Levine and Samuel Roland for their help in putting together this brief.

1

stands to foreclose. Congress wrote fair use as a flexible rule so that judges could balance each work, each use. By imposing a one-size-fits-all verdict, the district court traded judgment for fiat and arrogated a responsibility reserved for Congress. Rule 23(f) review is needed to restore modest judging and let America's startups keep building.

## INTRODUCTION AND SUMMARY OF ARGUMENT

As the district court sees it, this case "exemplifies the classic litigation" for Rule 23: every author is "aggrieved" by Anthropic's downloads from "pirate libraries," so proof of the "class-wide wrong" will be "straightforward." Order on Class Certification, *Bartz et al. v. Anthropic PBC*, No. C 24-05417 WHA, at 1 (N.D. Cal. July 17, 2025). On that view, seven million titles proceed in lockstep as questions of ownership wait until judgment.

To establish this logic, the district court took a snapshot of the pirated works in one moment of time, implied that Anthropic had become a digital book storage company, *sua sponte* created a class off this claim, ignored or carved out the true upstream and downstream uses of the storage, then certified said class by making a merits adjudication on fair use—while simultaneously claiming that any fair-use defense would be manageable class-wide. Facts point the other way on each step. As the district court noted, Tom Turvey testified that Anthropic did not intend its general research library—the class's predicate—merely to store files; rather, it

2

designed the library to "use [them] for research" and to "inform … products." Order on Fair Use, *Bartz et al. v. Anthropic PBC*, No. C 24-05417 WHA, at 4-5 (N.D. Cal. June 23, 2025). Two distinct end uses.

As for the class itself, Rule 23(b)(3) demands that "the questions of law or fact common to class members predominate" (Fed. R. Civ. P. 23(b)(3)); yet as seen in the district court's analysis of LLM training—the "one further use" recognized—the books varied in the extent they contained the "well-curated facts, well-organized analyses, and captivating fictional narratives" required to train a model. Fair Use Order at 5–6. Even so, the district court claims that such variance in book type and market impact—the core of the second and fourth prongs of fair use—give it "no reason to believe that it would not be susceptible to treatment by common evidence and common methods" in further analysis. Class Cert. Order at 26. By folding every book into one pirated-library class and postponing ownership and value, the order misses Rule 23(b)(3)'s demand for predominance. This claim of unvaried fair use can stand only so far as one book is as good as another—a claim which the district court itself has shown above to be untrue.

The district court may be correct that Anthropic should have purged its collection after deciding to stop training on the material, but in its haste to certify a class, it has created a dynamic that will preclude proper analysis of that question. It has drawn a qualitative distinction among the LLM training copies, the pirated

3

library copies, and any further downstream copies, but no quantitative one. Training is declared fair use, downstream LLM research may also be, but the prerequisite storage for both is not—that Anthropic is "liable" for. *Id.* at 24. For how long may a company retain such information when training a model? Is retention acceptable for downstream research purposes? Does the extent of acceptability vary with the content retained? The class papers over all these critical questions.

Normally, these issues should be handled on appeal. But the same over-reaching order leaves a threat of up to $1 trillion in potential statutory damages, creating "death-knell" settlement pressure. *Chamberlan v. Ford Motor Co.*, 402 F.3d 952 (9th Cir. 2005). Worse still, the blessing of this class would influence future litigation, in turn shrinking domestic innovation and weakening national security.

Because the order ignores predominance, and uses statutory damages as leverage, the Court should grant Rule 23(f) review, vacate certification, and remand with instructions to deny class treatment.

If the Court decides against decertification, Rule 23 supplies narrower tools: it may certify only the liability issue under Rule 23(c)(4) and defer ownership, willfulness, and damages; or it may order a bellwether trial on fair-use market

4

harm and revisit class lines once the record is complete. Either of those steps would cure the predominance defect while keeping real claims alive.

## ARGUMENT

### I.     PREDOMINANCE IS ABSENT, AND NOTICE SUFFERS THE SAME RULE 23(B)(3) MANAGEABILITY DEFECT

Anthropic's "pirated library" class sweeps in every LibGen and PiLiMi title the company kept after training—more than seven million ".pdf, .epub, and .txt" files. Fair Use Order at 3. The purpose of the cache was in fact provided: to conduct further research and inform products. That is active, post-training use, not inert storage. The summary-judgment order records that "hundreds of engineers" had access to this cache for future uses, confirming that each book remains an active, individual target of exploitation. *Id.* at 31. The works in question range from contemporary fiction to medical treatises to cookbooks. The class purports to represent the "owners of up to seven million books," with varying ownership structures.

Because downstream use hinges on content and market, fair-use factor 2 (nature of the work) and factor 4 (market effect) split along content lines (17 U.S.C. § 107(2), (4) (2018)). Works command different licenses, audiences, and substitutes—proven by Anthropic's engineers sifting and recopying different subsets precisely because each carried distinct training value. Factor-4 proof must

5

further ask whether a title is in subscription databases, whether the author licenses text-and-data mining, and how reuse hits print, e-book, or derivative sales. That granular proof is the opposite of the single-stroke convenient resolution Rule 23(b)(3) requires. See *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *Amchem Prods, Inc. v. Windsor*, 521 U.S. 591, 615 (1997).

Even far more uniform corpora require work-specific scrutiny. In *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 916 (2d Cir. 1994), all articles came from a few journals and served one research use, yet the district court still examined market effects from the individual uses of a representative subset of articles before finding infringement. Anthropic's cache of millions of diverse books demands individualized factor-2 and factor-4 analysis all the more. Yet the order proposes that statutory-damages questions—willfulness and market harm alike—be answered "on a categorical basis rather than an individual one," Class Cert. Order at 25, a shortcut irreconcilable with Rule 23(b)(3) and *Dukes*' bar on "Trial by Formula" (564 U.S. at 367).

The district court masked this diversity with a novel notice plan, deferring ownership and value until after trial and ordering plaintiffs to list by September 1 the works to be subject to "*Daubert* and defendant's exacting scrutiny." Class Cert. Order at 17. Because notice will not be sent until that list exists, the scheme avoids the obvious "likely difficulties in managing [the] class action" until after the class

is certified. Fed. R. Civ. P. 23(b)(3)(D). Seven-million mini-trials on registration, split ownership, niche markets, and statutory damage tiers flout superiority and manageability. Cf. *Van v. LLR, Inc.*, 61 F.4th 1053, 1068 (9th Cir. 2023).

Notice also distinguishes *Napster*, where the certified class was 27,000 members of an opt-in rights management group with prior contact (*In re Napster, Inc. Copyright Litig.*, No. C MDL-00-1369 MHP, 2005 WL 1287611 (N.D. Cal. June 1, 2005)). Here, rather than one main point of contact, the district court intends to canvass the country by "first-class mail and email to the author, publisher, and copyright owner listed on the copyright certificate for each work recorded." Class Cert. Order at 10. The manageability of locating potentially millions of unknown copyright holders is not detailed.

With issues this fractured, common questions cannot predominate. The Court should vacate the certification order and remand with instructions to deny class treatment—or, at most, to confine any class to issues that are truly common under Rule 23(b)(3).

## II.    RUINOUS STATUTORY DAMAGES RISK MAKES CLASS CERTIFICATION UNSUSTAINABLE AND THREATENS INVESTMENT, OPEN SOURCE, AND NATIONAL SECURITY

The certified class contains up to seven million unique LibGen and PiLiMi books. At the $150,000 cap per work, 17 U.S.C. § 504(c)(2), theoretical liability

exceeds $1 trillion—over 15 times Anthropic's $61.5 billion valuation and far beyond its resources. Under the mean statutory award of $23,848, the total would be $166 billion.[2] Under the statutory minimum of $750 with 100 percent overlap between LibGen and PiLiMi, damages would still be nearly $4 billion. Here, certification becomes a "death-knell," for it "put[s] considerable pressure on the defendant to settle independent of the merits." *Chamberlan*, 402 F.3d at 958 (quoting *Blair v. Equifax Check Servs.*, Inc., 181 F.3d 832, 834 (11th Cir. 1999)).

History confirms the point. Bryant G. Garth's empirical analysis found that 78 percent of certified class actions settled, compared with only 15 percent of putative class actions that never achieved certification.[3] Another study found that "virtually all cases certified as class actions and not dismissed before trial end in settlement."[4] Cases under the Telephone Consumer Protection Act (up to $1,500 per call) and Illinois's Biometric Information Privacy Act (up to $5,000 per scan) settle early—Facebook's $650 million BIPA deal exemplifies the pattern—because

---

[2] Benjamin K. Brady, Roy Germano & Christopher Jon Sprigman, *Statutory Damages Under the Copyright Act: An Empirical Study*, 2022 Mich. St. L. Rev. 1179, 1202 (2022).
[3] Bryant G. Garth, *Studying Civil Litigation Through the Class Action*, 62 Ind. L.J. 497 (1987).
[4] Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Stud. 811, 812 (2010).

no one risks multi-billion-dollar exposure. The stakes here are far higher; no fiduciary would send Anthropic to trial with a trillion-dollar ceiling.

*Chamberlan* warns that ruinous stakes invite settlement "without relation to the merits," 402 F.3d at 960 (quoting *In re Lorazepam*, 289 F.3d 98, 108 (D.C. Cir. 2002)), denying appellate courts the chance to refine defenses. The Second Circuit addressed that danger in *Authors Guild v. Google*, vacating certification so the district court could decide fair use first, reasoning that a merits ruling would "necessarily inform" any class inquiry. 721 F.3d 132, 134 (2d Cir. 2013). Without similar relief here, the parties will settle in doubt, and payment—untethered to a merits decision—will appear in future suits as *de facto* strict liability for large-scale text-and-data mining.

If the storage class is allowed to stand, that tacit blessing will invite similar claims against other firms that host training data. Each will confront the same death-knell arithmetic and settle rather than fight a lawsuit that could end the company. Copyright enforcement will thus migrate from case-specific analysis to de facto strict liability. Three areas will be hit hardest: venture capital, open-source development, and national security.

**Venture capital**. Startups exist because investors risk fixed dollars for open-ended gain; the threat of effectively uncapped settlements would ruin that trade. After the *Napster* injunction in 2000, media-and-entertainment funding fell sharply

9

from 10.3 percent of U.S. venture investment from 1995 to 2000, to 4.5 percent from 2000 to 2005.[5] One study of 31 executives on the impact of the *Napster* litigation found—after controlling for the bursting of the dot-com bubble—an overwhelmingly negative effect, with one venture capitalist referring to the digital music investment space as a "wasteland."[6] When the Court recognized inducement liability in *MGM v. Grokster*, 545 U.S. 913 (2005), peer-to-peer start-ups vanished. As one academic summed up the lesson: "The threat of massive copyright lawsuits deters venture capitalists and angels from investing in new internet platform[s]."[7] If trillion-dollar copyright classes are endorsed, capital will cluster at a few incumbents rich enough to license every book or self-insure, and challengers will stay out.

**Open-source development**. Open-source R&D anchors the U.S. AI ecosystem: 63 percent of businesses rely on open-source infrastructure and 60 percent adopt it for lower costs.[8] Yet these firms are least able to absorb a looming "copyright-due-diligence tax" if U.S. fair-use protections erode. Meanwhile, German courts have

---

[5] PricewaterhouseCoopers & Nat'l Venture Cap. Ass'n, *MoneyTree Report* (Thomson Reuters data) (2015).
[6] Michael A. Carrier, *Copyright and Innovation: The Untold Story*, 2012 Wis. L. Rev. 891, 895 (2012).
[7] Edward Lee, *Copyright-Exempt Nonprofits: A Simple Proposal to Spur Innovation*, 45 Ariz. St. L.J. 1433, 1440 (2013).
[8] McKinsey & Co., *Open Source Technology in the Age of AI* (Apr. 22, 2025).

already permitted copying six billion image-text pairs for an open corpus—

*Kneschke v. LAION e.V.*, No. 310 O 227/23 (LG Hamburg Sept. 27, 2024) (Ger.)

(Bird & Bird English summary). If every training copy here invites bet-the-

company risk, open-source will move offshore, and the flow of open data will

shrink.

**National security.** The Defense Department's Chief Digital and AI Office

follows a "commercial-first" plan because industry builds frontier models faster

than classified labs.[9] Officials have launched pilots with Anthropic and call large-

language models mission-essential. The U.S. Space Force's FY-2025 *Data and AI*

*Strategic Action Plan* echoes that view.[10] The National Security Commission on AI

warned that the U.S. is "not prepared to defend or compete in the AI era," and

urged regulators to avoid liability rules that freeze investment.[11] If leading vendors

face massive settlements—or if new firms cannot raise capital because one suit

could end them—defense agencies will be forced to revisit the foreign dependence

that plagued microelectronics and 5G.

---

[9] Chief Digital and Artificial Intelligence Office, *CDAO Announces Partnerships with Frontier AI Companies to Address National Security Mission Areas* (Press Release, July 14, 2025).
[10] U.S. Space Force, *Data and Artificial Intelligence FY 2025 Strategic Action Plan* (Mar. 19, 2025).
[11] Nat'l Sec. Comm'n on Artificial Intelligence, *Final Report* at 1 (2021).

11

Rule 23 exists to promote efficient, just resolution—not to impose de facto strict liability by fear. The Court should therefore halt this death-knell certification before its effects spread.

## CONCLUSION

The petition for permission to appeal should be granted.

August 7, 2025                                    Respectfully submitted,

                                                  /s/ Tim Hwang _____
                                                  Tim Hwang
                                                  FOUNDATION FOR
                                                  AMERICAN INNOVATION
                                                  2443 Fillmore St #380-3386
                                                  San Francisco, CA, 94115
                                                  Telephone: (973)-960-4955
                                                  tim.hwang@thefai.org

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing Brief of the Foundation for American Innovation As *Amicus Curiae* Supporting Petitioners And Rule 23(f) Leave To Appeal complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f), the brief contains 2518 words, and is proportionately spaced using a roman style typeface of 14-point.

August 7, 2025                          Respectfully submitted,

                                        /s/ Tim Hwang _____
                                        Tim Hwang
                                        Foundation for American Innovation
                                        2443 Fillmore St #380-3386
                                        San Francisco, CA, 94115
                                        Telephone: (973)-960-4955
                                        tim.hwang@thefai.org

## CERTIFICATE OF SERVICE

I certify that on August 7, 2025, the foregoing motion was filed using the

Court's CM/ECF system. All participants in the case are registered CM/ECF users

and will be served electronically via that system.

August 7, 2025                                    Respectfully submitted,

                                                  /s/ Tim Hwang ____
                                                  Tim Hwang
                                                  FOUNDATION FOR
                                                  AMERICAN INNOVATION
                                                  2443 Fillmore St #380-3386
                                                  San Francisco, CA, 94115
                                                  Telephone: (973)-960-4955
                                                  tim.hwang@thefai.org