No. 25-4843

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

ANDREA BARTZ, et al.,
*Plaintiffs-Respondents*,

v.

ANTHROPIC PBC,
*Defendant-Petitioner*.

On Petition for Permission to Appeal under Fed. R. Civ. P. 23(f)
United States District Court for the Northern District of California
No. 3:24-CV-05417-WHA (Hon. William H. Alsup)

**BRIEF OF TECHNET, AI PROGRESS, COMPUTER &
COMMUNICATIONS INDUSTRY ASSOCIATION, CONSUMER
TECHNOLOGY ASSOCIATION, AND ENGINE ADVOCACY
AS *AMICI CURIAE* IN SUPPORT OF PETITIONER**

Drew Hudson
TECHNET
1420 New York Avenue, N.W.
Suite 825
Washington, D.C. 20005

Stephanie Joyce
CCIA
25 Massachusetts Avenue, N.W.
Suite 300C
Washington, DC 20001

Jeffrey S. Beelaert
GIVENS PURSLEY LLP
601 West Bannock Street
Boise, Idaho 83701
(208) 388-1200
jbeelaert@givenspursley.com

Jill Crosby
ENGINE ADVOCACY
700 Pennsylvania Ave. S.E.
Washington, D.C. 20003

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

*Amici* certify under Rule 26.1 of the Federal Rules of Appellate Procedure that they have no parent corporation and that no publicly held company owns 10% or more of their stock.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iii

IDENTITY AND INTEREST OF *AMICI CURIAE* ................................. 1

INTRODUCTION .................................................................................. 3

ARGUMENT ........................................................................................ 5

I.    Class certification of copyright claims deprives AI companies of the opportunity to defend their actions. .................... 6

II.    Class certification will chill investment in American AI companies and damage America's technological competitiveness. ............................................................................ 8

    A.    Settlement pressure likely will prevent this Court's substantive review of critically important yet unresolved legal issues. .................................................. 9

    B.    Increased litigation risk from erroneously certified actions will chill AI investment. ............................ 10

CONCLUSION .................................................................................. 12

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES
Page
**Cases**

*Blair v. Equifax Check Services, Inc.*,
  181 F.3d 832 (7th Cir. 1999) .......................................................... 4, 10

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ............................................................................ 5

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994) ............................................................................ 7

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ........................................................................... 4, 5

*Coopers & Lybrand v. Livesay*,
  437 U.S. 463 (1978) ............................................................................ 9

*Football Ass'n Premier League Ltd. v. YouTube, Inc.*,
  297 F.R.D. 64 (S.D.N.Y. 2013) ........................................................... 6

*Google LLC v. Oracle Am., Inc.*,
  593 U.S. 1 (2021) ................................................................................ 4

*Haley v. Medtronic, Inc.*,
  169 F.R.D. 643 (N.D. Cal. 1996) ........................................................ 7

*Harper & Row Publishers, Inc. v. Nation Enters.*,
  471 U.S. 539 (1985) ............................................................................ 4

*Newton v. Merrill Lynch*,
  259 F.3d 154 (3d Cir. 2001) ................................................................ 9

*Schneider v. YouTube, LLC*,
  674 F. Supp. 3d 704 (N.D. Cal. 2023) ................................................ 6

*Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*,
   952 F.3d 1051 (9th Cir. 2020) .................................................................. 6

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ............................................................................ 4, 7

*White v. Symetra Assigned Bens. Serv.*,
   104 F.4th 1182 (9th Cir. 2024) .............................................................. 5

*Zinser v. Accufix Rsch. Inst., Inc.*,
   253 F.3d 1180 (9th Cir. 2001) ............................................................... 7

**Statute**

17 U.S.C. § 107 .................................................................................... 6

**Rules**

Fed. R. App. P. 29(a)(4)(E) .................................................................. 1

Fed. R. Civ. P. 23(b)(3) ........................................................................ 7

Fed. R. Civ. P. 23(f) ................................................................ 4, 10, 12

**Other Authorities**

Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*,
   7 J. Empirical Legal Stud. 811 (2010) .................................................. 9

Data Catalyst Institute, *The Economic Importance of Fair Use for the Development of Generative Artificial Intelligence* (June 2025) ............. 9

Mark A. Wynne & Lillian Derr, *Advances in AI Will Boost Productivity, Living Standards Over Time*, Fed. Reserve Bank of Dallas
   (June 24, 2025) ................................................................................... 10

Silicon Valley Bank, *State of Enterprise Software 2025 Report* ............. 11

# IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

**TechNet** is a national, bipartisan network of technology CEOs and senior executives that promotes the growth of the innovation economy. TechNet's diverse membership includes more than 100 companies ranging from startups to the most iconic companies on the planet in the fields of information technology, AI, e-commerce, the sharing and gig economies, advanced energy, cybersecurity, venture capital, and finance.[2]

**AI Progress** is a coalition of leading AI developers committed to the advancement of AI tools that can deliver benefits across societies and economic sectors, from public safety to scientific discovery. AI Progress champions the essential role of existing U.S. copyright law in fostering innovation, protecting intellectual property, and ensuring America's competitiveness in AI.[3]

The **Computer & Communications Industry Association** (CCIA) is an international, not-for-profit association representing a broad

---

[1] All parties have consented to this filing. No counsel for any party has authored this brief in whole or in part, and no entity or person, aside from *Amici* and their counsel, made any monetary contribution intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E).

[2] The full list of TechNet's members is available at www.technet.org/our-story/members/.

[3] The full list of AI Progress's members is available at www.progressforai.com.

1

cross-section of communications, technology, and Internet industry firms that collectively employ more than 1.6 million workers, invest more than $100 billion in research and development, and contribute trillions of dollars in productivity to the global economy. For more than 50 years, CCIA has promoted open markets, open systems, and open networks. CCIA regularly files amicus briefs in this and other courts to promote balanced copyright policies that reward, rather than stifle, innovation.[4]

**Consumer Technology Association** (CTA)® is North America's largest technology trade association representing the $537 billion U.S. consumer technology industry, which supports more than 18 million American jobs. CTA represents established companies and entrants of every size and specialty to encourage and promote innovation, and convenes CES®, the most powerful tech event in the world.

**Engine Advocacy** is a non-profit technology policy, research, and advocacy organization dedicated to bridging the gap between startups and policymakers. Engine works with government officials and a community of thousands of high-technology, growth-oriented startups across the nation to support the development of technology entrepreneurship through economic research, policy analysis, and advocacy on local and national issues. Engine's community of startups

---

[4] The full list of CCIA's members is available at www.ccianet.org/members.

2

includes companies developing and deploying AI across all industries and sectors.

*Amici* have a strong interest in ensuring that courts across the country apply rigorous standards for class certification. *Amici* agree with the arguments raised in Anthropic's petition but write separately to highlight a broader industry concern: the district court's erroneous class certification threatens immense harm not only to a single AI company, but to the entire fledgling AI industry and to America's global technological competitiveness.

## INTRODUCTION

Lawsuits like this one threaten devastating damages for defendants. While pressures imposed by erroneous class certification can distort our legal system, those distortions are magnified in cases alleging copyright infringement because statutory damages can reach $150,000 per work with no showing of actual harm. And in cases like this one, involving AI development, training AI models requires massive amounts of information, some of which may include copyrighted materials. So, the potential damages skyrocket.

The district court's class certification saddles Anthropic with hundreds of billions of dollars in potential statutory liability. Trial is set to begin in less than four months, on December 1, 2025, and the district court already has pressed the parties for settlement.

3

With the stakes so staggeringly high, it should come as no surprise that defendants often are compelled to settle even untested legal claims raised by plaintiffs rather than risk crippling damages. And, where a class certification decision compels settlement, the district court's ruling may escape appellate review, leaving a single judge with unreviewable power and leaving important underlying legal questions of first impression undecided. *Blair v. Equifax Check Services, Inc.*, 181 F.3d 832, 835 (7th Cir. 1999). An "appeal under Rule 23(f) is in order." *Id.*

This Court should grant Rule 23(f) review because the district court's class-certification order contradicts well-established Supreme Court precedent. The district court failed to conduct the necessary "rigorous analysis" to ensure that Rule 23's requirements were satisfied here. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011)).

No court has ever certified a copyright class action of this magnitude. That is true for good reason. Issues like fair use often involve "a mixed question of law and fact," *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560 (1985), and courts generally should "break" the fair-use question "into its separate factual and legal parts," *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 24 (2021). The district court's erroneous decision—if not corrected—inevitably will lead to further abuse of class-action litigation, which, in turn, will have profoundly

4

detrimental consequences for the continued growth of the innovation economy. It cannot stand.

## ARGUMENT

District courts have a duty to take a hard look at class certification. *Comcast*, 569 U.S. at 34. This case illustrates exactly why. A comparatively straightforward lawsuit filed by three individual authors rapidly has morphed into an unprecedented and gargantuan class action that threatens an entire industry with ruinous financial liability.

Class actions should not be so freely certified. Rule 23 was designed as "an *exception* to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979) (emphasis added). This Court should not hesitate to reverse a "legally improper" class certification. *White v. Symetra Assigned Bens. Serv.*, 104 F.4th 1182, 1194 (9th Cir. 2024).

Anthropic's petition (at 9–21) explains how the district court failed to apply Rule 23 properly. *Amici* fully support those arguments and wish to highlight how allowing the district court's erroneous class certification order to stand will deprive AI companies of the opportunity to defend their actions and how it will chill investment and innovation in the American AI industry.

5

## I. Class certification of copyright claims deprives AI companies of the opportunity to defend their actions.

To establish copyright infringement, a plaintiff must show both valid ownership and that the defendant unlawfully copied and appropriated the copyrighted work. *See, e.g.*, *Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020) (en banc). These must be *individualized* inquiries.

"Every copyright claim turns 'upon facts which are particular to that single claim of infringement, and separate from all the other claims.'" *Schneider v. YouTube, LLC*, 674 F. Supp. 3d 704 (N.D. Cal. 2023) (quoting *Football Ass'n Premier League Ltd. v. YouTube, Inc.*, 297 F.R.D. 64, 66 (S.D.N.Y. 2013)). That is what makes copyright infringement claims such "poor candidates for class-action treatment." *Waite v. UMG Recordings, Inc.*, No. 19-CV-01091 (LAK), 2023 WL 1069690, at *10 n.85 (S.D.N.Y. Jan. 27, 2023) (quoting *Football Ass'n*, 297 F.R.D. at 66).

Defenses to claims of copyright infringement, too, are individualized inquiries unsuited to categorical or representative treatment, especially on such an unwieldy scale. *Schneider*, 674 F. Supp. 3d at 717. Indeed, the fair use of a copyrighted work is *not* copyright infringement, and determining whether a particular use was fair is an individualized inquiry that requires a court to weigh several factors as to each specific work alleged to be infringed. *See* 17 U.S.C. § 107. "The task

6

is not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994).

The district court erred in concluding that the common question of alleged infringement for class members predominates over questions affecting individual members, such as whether the alleged infringement was fair use, the impact of the alleged infringement on the market for each individual work, and whether a class-action lawsuit "is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In cases like this one, in which "each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually," a putative class action does not and cannot satisfy the predominance requirement. *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1192 (9th Cir. 2001).

Even if there is "a common nucleus of facts concerning a defendant's conduct"—*e.g.*, in downloading books—that alone cannot justify class certification when "there are just too many individual issues" remaining for the court to resolve for liability. *Id.* (quoting *Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 654 (N.D. Cal. 1996)).

Defendants have the right to scrutinize each claim through discovery while also litigating "its statutory defenses to individual claims," *Dukes*, 564 U.S. at 367, such as a lack of ownership, invalidity, or de minimis copying. Because of the individualized nature of copyright

7

claims and defenses, class certification deprives defendants of those rights.

The district court's decision lumps together countless individuals and entities from across the globe, forcing their individualized claims to be adjudicated in this massive, unprecedented lawsuit. And defending such a case as a class action deprives Anthropic of its ability to obtain discovery regarding individualized issues and to test individualized flaws in plaintiffs' copyright infringement claims.

## II. Class certification will chill investment in American AI companies and damage America's technological competitiveness.

The district court certified a massive class with millions of putative members, each with a potential claim for statutory damages of $150,000 per work with no showing of actual harm. With up to seven million potential claimants, that easily qualifies this case as one of the largest class actions ever certified. If there were indeed seven million claimants, statutory damages of $150,000 per work could exceed the entire gross domestic product of each of 171 countries, including Switzerland.

For historical comparison, the landmark 1998 Tobacco Master Settlement Agreement required tobacco companies to pay an estimated $206 billion over a span of twenty-five years, and that litigation included class members with smoking-related illnesses and decades of evidence demonstrating the causal connection to their injuries. Here, the district court has certified a class with the potential for statutory copyright

8

damages that far exceed the tobacco settlement, all without any showing of actual harm.

Even a small risk of incurring such extraordinary damages is coercive enough to force almost any defendant to settle. And in this case, given the immense amount of material required to train large language models and the liability risk posed by erroneous class certification, allowing this certification to stand undoubtedly will chill investment and innovation in AI.

### A. Settlement pressure likely will prevent this Court's substantive review of critically important yet unresolved legal issues.

Class certification "places inordinate or hydraulic pressure on defendants to settle." *Newton v. Merrill Lynch*, 259 F.3d 154, 164 (3d Cir. 2001). Studies show that after a district court certifies a class, parties routinely settle, regardless of the merits. "[V]irtually all cases certified as class actions and not dismissed before trial end in settlement." Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Stud. 811, 812 (2010). "Certification of a large class may so increase the defendant's potential damages liability and litigation costs that he may find it economically prudent to settle and to abandon a meritorious defense." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 476 (1978).

Denying Anthropic the opportunity for appellate review of the district court's certification order likely will mean, as a practical matter,

9

that Anthropic never will obtain review of the novel legal issues presented here, leaving the district court's faulty analysis unchecked—even as other AI companies must defend themselves in similar lawsuits absent this Court's guidance. This Court should grant the Rule 23(f) petition to "facilitate the development of the law." *Blair*, 181 F.3d at 835.

### B. Increased litigation risk from erroneously certified actions will chill AI investment.

Like many technologies before it, AI offers the potential to improve productivity across the entire economy and to improve living standards here in the United States and across the globe. *See, e.g.*, Mark A. Wynne & Lillian Derr, *Advances in AI Will Boost Productivity, Living Standards Over Time*, Fed. Reserve Bank of Dallas (June 24, 2025).[5]

AI is one of the most heavily invested-in areas of America's technology economy. Corporate investment in AI exceeded $360 billion in 2021, as calculated by Stanford University's Institute for Human-Centered Artificial Intelligence.[6] And "venture capital investment in GenAI firms between 2019 and 2024 flowed overwhelmingly to the U.S., reaching $53.6 billion compared to just $6.8 billion in Europe." Data Catalyst Institute, *The Economic Importance of Fair Use for the*

---

[5] https://www.dallasfed.org/research/economics/2025/0624

[6] https://hai.stanford.edu/ai-index/2025-ai-index-report/economy

10

*Development of Generative Artificial Intelligence* (June 2025).[7] AI startups see investments, too. Approximately 40% of all American venture-capital money raised by startups in 2024 came from funds focused on AI. *See* Silicon Valley Bank, *State of Enterprise Software 2025 Report* at 9.[8]

AI companies require heavy investment because of the high cost of development. "Despite the decreasing cost of software and higher-efficiency scale for AI startups, capital requirements for AI may remain elevated due to high compute costs, expenses of attracting top-tier talent, and building proprietary infrastructure for training, fine-tuning and deploying models." *Id.* at 18.

Of course, the potential award of astronomical damages does not necessarily defeat class certification. *Amici* emphasize, however, that such potential liability in this case exerts incredibly coercive settlement pressure for Anthropic. And that pressure will extend beyond just this case as the district court's decision inevitably will create a snowballing effect. Other AI companies will face similar liability in class-action litigation if this Court allows the district court's ruling to stand.

---

[7] https://datacatalyst.org/reports/the-economic-importance-of-fair-use-for-the-development-of-generative-artificial-intelligence/

[8] https://www.svb.com/trends-insights/reports/state-of-enterprise-software/

11

Class certification for alleged copyright infringement—involving millions of putative class members—will chill investment in AI companies as investors will avoid the threat of such catastrophic liability. Even the litigation costs for a defense are staggering. Only the largest companies in the world may have the resources to defend themselves on the merits (if even they could do so).

This Court should not allow the district court's erroneous class certification to stand, as it will embolden other litigants to follow. The entire AI industry needs this Court to provide guidance as to the novel legal issues raised in this case—which now has become the largest copyright class action ever certified. As generative AI begins to shape the trajectory of the global economy, the technology industry cannot withstand such devastating litigation. The United States currently may be the global leader in AI development, but that could change if litigation stymies investment by imposing excessive damages on AI companies.

## CONCLUSION

This Court should grant the Rule 23(f) petition.

Respectfully submitted,

| | |
|---|---|
| Drew Hudson<br>TECHNET<br>1420 New York Avenue, N.W.<br>Suite 825<br>Washington, D.C. 20005 | */s/ Jeffrey S. Beelaert*<br>Jeffrey S. Beelaert<br>GIVENS PURSLEY LLP<br>601 West Bannock Street<br>Boise, Idaho 83701<br>(208) 388-1200<br>jbeelaert@givenspursley.com |
| Stephanie Joyce<br>CCIA<br>25 Massachusetts Avenue, N.W.<br>Suite 300C<br>Washington, DC 20001 | Jill Crosby<br>ENGINE ADVOCACY<br>700 Pennsylvania Ave. S.E.<br>Washington, D.C. 20003 |

*Counsel for Amici Curiae*

August 7, 2025

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the word limit set forth in Federal Rule of Appellate Procedure 29(b)(4) because, excluding the parts of the brief exempted by Rule 32(f), this brief contains 2,472 words.

I further certify that this brief complies with the typeface requirements set forth in Rule 32(a)(5)(A) and with the type-style requirements set forth in Rule 32(a)(6) because it has been prepared using 14-point Century Schoolbook font in Microsoft Word.

*/s/ Jeffrey S. Beelaert*
Jeffrey S. Beelaert
Counsel for Amici Curiae

14