No. 25-4843

# United States Court of Appeals for the Ninth Circuit

ANDREA BARTZ; CHARLES GRAEBER; KIRK WALLACE JOHNSON,

*Plaintiffs-Respondents,*

— v. —

ANTHROPIC, PBC,

*Defendant-Petitioner.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA IN CASE NO.: 3:24-CV-05417,
HONORABLE JUDGE WILLIAM ALSUP

## BRIEF OF THE AUTHORS GUILD, INC., INTERNATIONAL THRILLER WRITERS, ROMANCE WRITERS OF AMERICA, AND THE SCIENCE FICTION AND FANTASY WRITERS OF AMERICA D/B/A SCIENCE FICTION AND FANTASY WRITERS ASSOCIATION AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-RESPONDENTS

ROBERT W. CLARIDA
JAMES NG
REITLER KAILAS & ROSENBLATT LLP
*Attorneys for Amici Curiae The Authors
    Guild, Inc., International Thriller
    Writers, Romance Writers of America,
    and the Science Fiction and Fantasy
    Writers of America d/b/a Science Fiction
    and Fantasy Writers Association*
885 Third Avenue, 20th Floor
New York, New York 10022
(212) 209-3050

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 34. Disclosure Statement under FRAP 26.1 and Circuit Rule 26.1-1

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form34instructions.pdf

**9th Cir. Case Number(s)**  25-4843

Name(s) of party/parties, prospective intervenor(s), or amicus/amici filing this form:

> The Authors Guild, Inc., International Thriller Writers, Romance Writers of America, and the Science Fiction and Fantasy Writers of America DBA Science Fiction and Fantasy Writers Association

Under FRAP 26.1 and Circuit Rule 26.1-1, I make the following disclosures:

1. I disclose the following information required by FRAP 26.1(a) and/or Circuit Rule 26.1-1(b) for any nongovernmental corporation, association, joint venture, partnership, limited liability company, or similar entity[1] which is a party, prospective intervenor, or amicus curiae in any proceeding, or which the government identifies as an organizational victim below in section 2 of this form,[2] or which is a debtor as disclosed below in section 3 of this form.

   a. Does the party, prospective intervenor, amicus, victim, or debtor have any parent companies? Parent companies include all companies that control the entity directly or indirectly through intermediaries.
   ○ Yes    ◉ No

   If yes, identify all parent corporations of each entity, including all generations of parent corporations *(attach additional pages as necessary)*:

   b. Is 10% or more of the stock of the party, prospective intervenor, amicus, victim, or debtor owned by a publicly held corporation or other publicly held entity?
   ○ Yes    ◉ No

---

[1] A corporate entity must be identified by its full corporate name as registered with a secretary of state's office and, if its stock is publicly listed, its stock symbol or "ticker."

[2] To the extent it can be obtained through due diligence.

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 34**                                                      *New 12/01/24*

If yes, identify all such owners for each entity *(attach additional pages as necessary)*:

2. In a criminal case, absent good cause shown, the government must identify here any organizational victim of the alleged criminal activity:

3. In a bankruptcy case, the debtor, the trustee, or, if neither is a party, the appellant must identify here each debtor not named in the court of appeals caption:

4. Are you aware of any judge serving on this Court who participated at any stage of the case, either in district court, administrative proceedings, or in related state court proceedings?

   ○ Yes    ◉ No

   If yes, list the name of the judge and the case name, case number, and name of court of the related proceedings:

I certify that *(select only one)*:

◉ this is the first disclosure statement filed in the above-referenced case by the above-identified party/parties, prospective intervenor(s), or amicus/amici, and this disclosure statement complies with FRAP 26.1 and Circuit Rule 26.1-1.

○ the party/parties, prospective intervenor(s), or amicus/amici submitting this supplemental disclosure statement has previously filed a compliant disclosure statement in this case, and this updated disclosure statement discloses changed or additional information.

○ I have reviewed this form, FRAP 26.1, and Circuit Rule 26.1-1 and, to the best of my knowledge, have no information to disclose at this time.

**Signature** | s/Robert W. Clarida | **Date** | August 21, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 34**                                                           *New 12/01/24*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...................................................................... ii

PRELIMINARY STATEMENT ................................................................1

STATEMENT OF INTEREST OF *AMICI CURIAE* ...............................1

SUMMARY OF ARGUMENT .................................................................3

ARGUMENT ...........................................................................................5

    I.     COMMON ISSUES PREDOMINATE AMONG MEMBERS
           OF THE CERTIFIED CLASS ......................................................5

         A.   Hypothetical Copyright Ownership Issues Between
              Putative Class Members Provide No Basis For
              Revisiting the Class Certification Order ....................................5

         B.   Hypothetical Duration and Chain-of-Title Issues for
              Specific Works Provide No Basis For Revisiting the
              Class Certification Order ...........................................................8

    II.    THE DISTRICT COURT'S NOTIFICATION PROCESS
           WILL PROVIDE EFFECTIVE NOTICE TO CLASS
           MEMBERS ...............................................................................13

CONCLUSION .......................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

**Statutes & Other Authorities:**

CASE Act of 2019 ...................................................................10

Digital Millenium Copyright Act § 512 .................................10

Balázs Bodó, "The Genesis of Library Genesis: The Birth of a Global
    Scholarly Shadow Library", in *Shadow Libraries: Access to Knowledge*
    *in Global Higher Education*, ed. Joe Karaganis, MIT Press, 2018 ......................8

Office of the United States Trade Representative Annual
    Review of Notorious Markets for Counterfeiting and Piracy,
    https://ustr.gov/about/policy-offices/press-office/ustr-archives/2007-
    2024-press-releases/ustr-releases-2024-review-notorious-markets-
    counterfeiting-and-piracy ........................................................7

*University of Michigan suspends HathiTrust Orphan Works Project.*
    *Claims "proposed uses of orphan works are lawful," and promises a*
    *reboot,* The Authors Guild, at https://authorsguild.org/news/hathitrust-
    orphan-works-project/ ...........................................................11

ii

## PRELIMINARY STATEMENT[1]

The Authors Guild, Inc., International Thriller Writers, Romance Writers of America, and the Science Fiction and Fantasy Writers of America DBA Science Fiction and Fantasy Writers Association (collectively, "*Amici*") respectfully submit this Memorandum of Law in Support of Plaintiffs-Respondents opposition to the Petition for Permission to Appeal from the U.S. District Court for the Northern District of California.

## STATEMENT OF INTEREST OF *AMICI CURIAE*

The *Amici* are organizations that represent the professional interests of writers and other creators.

Founded in 1912, *Amicus* The Authors Guild, Inc. (the "Guild") is a national non-profit association of over 16,000 professional, published writers of all genres including periodicals and other composite works. The Guild counts among its members the full spectrum of American authors, including novelists, historians, biographers, academicians, journalists, and other writers of nonfiction and fiction. The Guild works to promote the rights and professional interests of authors in various areas, including copyright, freedom of expression, and fair pay. Many Guild

---

[1] The parties have consented to the submission of this brief by *amici curiae*. Neither the parties nor their counsel have authored this brief, and neither they nor any other person or entity other than counsel for *amici curiae* contributed money that was intended to fund preparing or submitting this brief.

members earn their livelihoods through their writing. Their work covers important issues in history, biography, science, politics, medicine, business, and other areas; they are frequent contributors to the most influential and well-respected publications in every field. The Guild's members are the creators on the front line, fighting for their constitutional rights under copyright to reap financial benefits from their labors.

*Amicus* International Thriller Writers ("ITW") is an organization of thriller writers comprised of 6600 members in over 52 countries with over 3.6 billion books in print. ITW is devoted to supporting authors, is a thought leader in the AI field, and is dedicated to aligning thriller writers with organizations working to protect the rights of authors.

*Amicus* The Science Fiction and Fantasy Writers of America DBA Science Fiction and Fantasy Writers Association ("SFWA") is a 501(c)(3) nonprofit organization focused on providing support, defense, advocacy, education, and resources for speculative writers and the publishing industry. SFWA was founded in 1965 and is home to over 2,500 authors, artists, and allied professionals worldwide. The mission of the Science Fiction and Fantasy Writers Association includes the promotion, writing, and appreciation of science fiction, fantasy and related genres and fields. Its work involves informing, supporting, promoting, defending, and advocating for writers of science fiction, fantasy and related genres, with a focus on promoting and defending the interests of writers in these genres

within the publishing industry. Each year, SFWA assists members in various legal disputes, administers grants to SFF community organizations and members facing medical or legal expenses, and hosts the prestigious Nebula Awards at our annual Nebula Awards Conference.

*Amicus* Romance Writers of America Inc. is a nonprofit trade association whose mission is to advance the professional and common business interests of career-focused romance writers through networking and advocacy and by increasing public awareness of the romance genre.

## SUMMARY OF ARGUMENT

The petition should be denied. Defendant-Petitioner Anthropic PBC ("Anthropic") has engaged in willful infringement of copyrighted literary works ("Works") on a massive scale. Anthropic has created a vast online database of pirated Works, including Works that Anthropic downloaded from the unauthorized online repositories LibGen and PiLiMi. Cert. Order at 11. The District Court correctly found that this factual record presented "the classic case for certification," *id.* at 15, and ordered that the class shall include "beneficial or legal copyright owners of the exclusive right to reproduce copies" of any qualifying book copied by Anthropic from these repositories.[2]

---

[2] Qualifying books must have been timely registered with the U.S. Copyright Office and must bear an ISBN/ASIN number. Cert. Order at 9.

The claims at issue here amount to a simple, straightforward case of digital piracy. Authors and publishers regularly encounter and address piracy collaboratively, if not on this monstrous, unprecedented scale. Authors and publishers, including those who comprise this certified "LibGen and PiLiMi Pirated Books Class" ("Class," see *id.* at 11) are almost unanimously united in their opposition to digital piracy of their Works, and regularly work together to fight it. Here, their Works have been subject to unauthorized downloading by Anthropic as alleged without contradiction. Accordingly, common questions of law and fact as to all similarly-situated copyright owners would overwhelmingly predominate, and could be effectively adjudicated using "common evidence" and "methods." *Id.* at 16-20. Any authors or publishers who may not wish to enforce their copyrights against Anthropic's piratical company-wide policies and practices remain free to opt out.

Further, the experience of *amici* in locating and contacting large numbers of authors regarding online piracy and related matters demonstrates that the class notification plan established by the Court is eminently workable in practice.

Anthropic's infringements have caused significant harm to *amici*'s members and should be resolved without the unnecessary and unwarranted delay of an interlocutory appeal on the issue of class certification. Anthropic's petition to appeal should be denied in all respects.

## **ARGUMENT**

### I.  COMMON ISSUES PREDOMINATE AMONG MEMBERS OF THE CERTIFIED CLASS

#### A.  Hypothetical Copyright Ownership Issues Between Putative Class Members Provide No Basis For Revisiting the Class Certification Order.

Anthropic and its *amici* argue that identification of copyright owners within the certified Class could require individualized examination of the ownership of each work and related contracts in order to determine who owns the exclusive reproduction right for each illegally downloaded Work, see Petition at 10-12, and further suggests that there will be disputes among them. See Petition at 14.  But this is a red herring, because *both* parties to such contracts and licenses, namely authors and publishers, overwhelmingly agree that digital piracy must be stopped and addressing third party infringement is squarely and clearly addressed in publishing agreements, with standard terms across the industry, which contemplate exactly the kind of cooperation that is occurring now between authors and their publishers and as the district court observed. The District Court recognized that authors and publishers will endeavor to "work out the best way to recover," Cert. Order at 12, in light of their "ongoing business relationships," *id.* at 25-26, and it established judicial procedures for addressing any disputes that might arise. *Id.* As the Court

concluded, any such disputes would be "manageable" and would not overwhelm the common issues among Class members.[3]

The District Court is correct. *Amici* have enjoyed a long and productive history of cooperation between authors and publishers in their common efforts to address digital piracy of literary works. For example, in December 2021, The Authors Guild, Amazon Publishing, and Penguin Random House successfully sued notorious pirate site Kiss Library for $7.8 million in statutory copyright damages and a permanent injunction, which led to the site's removal. *See generally,* https://authorsguild.org/news/u-s-district-court-grants-win-to-plaintiffs-in-kiss-library-ebook-piracy-suit/. The Authors Guild and publishers have collaborated in making criminal copyright infringement referrals against notorious pirate sites to the U.S. government, including Z-Library and Library Genesis. The Authors Guild provided assistance to federal investigators and prosecutors in Z-Library's criminal indictment in the Eastern District of New York, which led to the arrest of two of its principals in 2022 and approximately 249 interrelated web domains. The Authors Guild and publishers' anti-piracy teams liaise with each other to monitor new pirate

---

[3] The District Court also noted, *id.* at 13, that "in the very unlikely event such ruinous conflicts become overwhelming, the district court can decertify the class."

sites.[4] In addition, *amicus* The Authors Guild and the Association of American Publishers regularly share information about piracy and both provide information to the Office of the United States Trade Representative for its annual Review of Notorious Markets for Counterfeiting and Piracy, which reports online and physical markets that commit or facilitate substantial copyright piracy. *See generally,* https://ustr.gov/about/policy-offices/press-office/ustr-archives/2007-2024-press-re leases/ustr-releases-2024-review-notorious-markets-counterfeiting-and-piracy.

Similarly, individual authors frequently alert their publishers to pirate editions of their works. Publishers themselves have taken legal action against mass digital infringers, such as the 2017 and 2023 actions brought by Elsevier and Cengage respectively against LibGen.[5]

At every level, in every field of publishing, the community of authors and publishers is united in its determination to enforce the rights of copyright owners and combat the plague of digital piracy of literary works.

---

[4] https://authorsguild.org/news/federal-law-enforcement-indicts-z-library-operators-with-ag-assistance/; https://www.justice.gov/usao-edny/pr/two-russian-nationals-charged-running-massive-e-book-piracy-website.

[5] https://authorsguild.org/news/elsevier-wins-15m-judgment-major-pirate-site/; https://www.theguardian.com/books/2023/sep/15/four-large-us-publishers-sue-shadow-library-for-alleged-copyright-infringement.

**B.** **Hypothetical Duration and Chain-of-Title Issues for Specific Works Provide No Basis For Revisiting the Class Certification Order.**

Anthropic and its *amici* further speculate that duration and chain-of-title issues for particular Works may require extensive individual adjudication that would overwhelm the factual and legal commonalities. Such speculation is unfounded and ignores the practical, legal and commercial realities of the publishing industry. It certainly provides no basis for revisiting the District Court's class certification.

First, let's be clear that the vast majority of Works stored in the LibGen and PiLiMi repositories – and thus the Works at issue for the Class – were copied from ebooks,[6] a technology of relatively recent vintage, and so were published in that format in the last two decades, meaning that the publishers are easy to find and that they will have paid advances or royalties to, and so will have contact information for, the authors or heirs.

Moreover, they were in almost all cases illegally uploaded e-books.[7] Because these Works were published relatively recently, the ownership of reproduction rights will be readily ascertainable in the overwhelming number of cases. Unlike the

---

[6] See generally Balázs Bodó, "The Genesis of Library Genesis: The Birth of a Global Scholarly Shadow Library", in *Shadow Libraries: Access to Knowledge in Global Higher Education*, ed. Joe Karaganis, MIT Press, 2018, pp 25-51.

[7] See https://alexreisner.substack.com/p/how-old-are-the-books-in-ai-training?triedRedirect=true.

"Google Books" litigation, see generally, https://authorsguild.org/news/authors-guild-v-google-settlement-resources-page/, which involved scanning physical books from library shelves, many of them older works that had been out-of-print for decades, this case does not involve large numbers of works that are long since out-of-print and whose exclusive reproduction rights are otherwise untraceable to one or more particular rightsholders.[8]

With respect to Works published in or after 1964, for which renewal registration was not mandatory, the continuing subsistence of a Work's copyright is not an issue and will not become an issue for some time.  Regarding Works of joint authorship, or Works incorporating the contributions of multiple authors such as anthologies, the publication contracts for such Works will in virtually every case identify a single holder of exclusive reproduction rights for the Work in its entirety, typically the publisher.  That is the right that Anthropic has violated by downloading the Work wholesale from LibGen or PiLiMi. Anthropic and its *amici* have hypothesized conditions which are in fact quite rare and have not come forward with any non-speculative basis for this Court to conclude otherwise.

---

[8] In addition, the book rights registry established in connection with the Google Books action was to set up an ongoing collective rights registry, not just to identify one-time payees, as here.  Contrary to the brief of Anthropic's *amici* Authors Alliance *et al.* at 6-7, there is no legitimate basis to suggest any comparison between the administrative costs of this case and those incurred in the Google Books dispute.

Anthropic's *amicus* Authors Alliance also raises the specter of so-called "orphan works" as a basis for revisiting the District Court's Certification Order. *See, e.g., Brief of Amici Curiae Authors Alliance et. al.* (Dkt. 8.1) at 6.[9] This argument

---

[9] Authors Alliance represents a tiny sector of the authorial world, principally the interests of a small group of academic writers who earn money from their university positions, for whom being read and cited brings prestige and career advancement. Such authors do not depend on the books they write to earn money, but are interested primarily in the reputational benefits of publication. *Amici* support these interests as well, but believe strongly that copyright law allows writers to decide whether and how they wish to enforce their copyrights. Authors Alliance, however, consistently takes the most extreme anti-copyright stance on every issue, ultimately supporting the interests of those who seek to weaken copyright and not pay authors. For example, Authors Alliance opposed the creation of a small-claims copyright tribunal pursuant to the CASE Act to allow authors and other rights holders to seek copyright damages through an accessible, cost-efficient forum without having to spend hundreds of thousands of dollars in litigating copyright claims in federal court. See https://www.authorsalliance.org/2019/06/04/copyright-law-has-a-small-claims-problem-the-case-act-wont-solve-it%ef%bb%bf/. Notably, the Authors Alliance has opposed efforts to reform section 512 of the Digital Millenium Copyright Act to require internet services providers to do more to curb piracy. See https://www.authorsalliance.org/wp-content/uploads/2020/12/20201201_AuthorsAlliance_DMCA_Reform.pdf. And the organization has supported AI companies' views that training on books is fair use, in contradiction to the vast majority of authors. See https://www.authorsalliance.org/2023/08/30/copyright-and-generative-ai-our-views-today/. Theirs is a particularly marginal view among authors. A survey of authors conducted by the Authors Guild found that only 3% of respondents believed that AI companies should be able to use authors' works without their consent, with others believing that they should be paid if their works are used to build and further develop an AI system. See https://authorsguild.org/news/ag-ai-survey-reveals-authors-overwhelmingly-want-consent-and-compensation-for-use-of-their-works/. Moreover, a recent survey of 850 academic book authors—the primary constituents Authors Alliance purports to represent—found that only 3% of academic authors support entirely "unregulated use (without consent, compensation, or attribution) of their publications for LLM training, with an additional 3%

is another red herring. In the context of books, finding rightsholders is far easier than with other types of works, such that there are very few orphan books. Unlike, for example, photographs, books almost always carry rightsholder information—the name of the author and the name and address of the publisher—on the face of the work itself. As a result, for the vast majority of books, simple internet searches are sufficient to identify relevant rightsholders or their successors in interest. Indeed, more than a decade ago, when the HathiTrust digital repository announced an "Orphan Works Program" aimed at making out-of-print books available to the public, The Authors Guild and its members quickly found, through basic online searches, rightsholder information for many of the books that the program had incorrectly designated as orphans. See, e.g., *University of Michigan suspends HathiTrust Orphan Works Project. Claims "proposed uses of orphan works are lawful," and promises a reboot,* The Authors Guild, at https://authorsguild.org/news /hathitrust-orphan-works-project/. In short, the impact of the "orphan works" problem on class certification here is insignificant. A 2005 Copyright Permissions Survey of 2100 authors conducted in connection with the Copyright Office's Notice of Inquiry on "Orphan Works" by *amicus* The Authors Guild showed that the overwhelming majority of published writers – 89.4% – have "never" or "rarely"

---

supporting use without consent or compensation, but only as long as authorship is appropriately attributed." https://scholarlykitchen.sspnet.org/2025/08/12/guest-post -who-controls-knowledge-in-the-age-of-ai-part-1/.

failed to reach a rightsholder when seeking to request permission.[10] Since then, technology has grown to facilitate location and identification of even more rights holders. In addition, the Authors Guild was able to successfully clear 82% of the rights for old, out of print works as part of a program in collaboration with the New York Public Library to digitize older works. Other organizations, like Authors Coalition of America ("ACA"), similarly report success in locating authors to disburse collective licensing royalties; the ACA, of which *amicus* The Authors Guild is a member, can successfully locate up to 80% of authors they seek with little effort.

Locating such information will be even easier in this case because all of the Works subject to the class action are, by definition, registered with the Copyright Office and have ISBN/ASIN numbers. It is therefore exceedingly unlikely that any Work that qualifies as an actionable "Book" for purposes of this action, *see* Cert. Order at 9 (defining "Book"), could not be linked to an identifiable author, publisher or other copyright owner. Between the copyright registration information, the ISBN/ASIN number, and Plaintiffs' direct notification to every trade and university press in the U.S. and well over a hundred thousand authors, discussed *infra*, very few Books will go unclaimed by a rightful owner.

---

[10] https://www.copyright.gov/orphan/comments/reply/OWR0135-Authors Guild.pdf.

## II. THE DISTRICT COURT'S NOTIFICATION PROCESS WILL PROVIDE EFFECTIVE NOTICE TO CLASS MEMBERS

The District Court established a process for notifying class members ("Process") whereby Plaintiffs must, *inter alia*, (1) contact, by mail and email, the author, publisher and copyright owner listed in the copyright registration certificate for each qualifying downloaded Work; (2) contact, by mail and email, all trade and university publishers in the U.S.; and (3) publish a notice at least once in a trade journal. Cert. Order at 10. In addition, each class claimant must further serve notice on all others who may claim a copyright interest in the Work – "including all those with whom he has contracted concerning the copyright and/or publishing" – to advise such persons that the claimant is asserting a claim to the Work. *Id.*

*Amici* can confirm that the Process established by the District Court will practicably provide effective notice to the overwhelming majority of potential class members. The following authors organizations have agreed to notify their respective members of the class certification in this action and to direct them to the intake portal created by Plaintiffs' class counsel at https://www.lieffcabraser.com/anthropic-author-contact/, where authors can enter their mailing address, e-mail, book title(s), and ISBN/ASIN(s) ("Class Action Website"):

- The Authors Guild

- Textbook and Academic Authors Association (TAA)

- Draft2Digital

13

- Sisters in Crime (SinC)

- Novelists Inc.

- Garden Communicators

- Atlanta Writers Club

- Alliance of Independent Authors

- International Thriller Writers

- Latinix Kid Lit Festival

- Community of Literary Magazines and Presses (CLMP)

- National Writers Union

- PEN America

- Association of Writers & Writing Programs

- National Association of Science Writers

- Science Fiction & Fantasy Writers Association

- Biographers International Organization

- Romance Writers of America

Through a similar group, *amicus* The Authors Guild was able to reach approximately 250,000 authors requesting them to participate in its 2023 authors earnings survey. See https://authorsguild.org/news/key-takeaways-from-2023-author-income-survey/. In addition, the Association of American Literary Agents ("AALA"), which represents authors' agents, has notified its members of the class certification. The

AALA, to which most literary agents belong, has approximately 600 agents among its membership. It is notifying all members and asking these agents to send their author-clients the link to the Class Action Website in this case in order to provide their current contact information. The Plaintiffs' counsel in this case are also directly contacting the larger literary agencies, as described in the Plaintiffs' <u>Motion to Approve Class Notice</u> (ECF 317) filed on August 15, 2025.

*Amicus* The Authors Guild has facilitated contact with authors by providing contact information for over forty thousand authors and authors' estates to counsel in this case on a confidential basis, pursuant to subpoena. In addition, it is publicizing the class certification and Class Action Website through its social media accounts on Bluesky, LinkedIn, Threads, Facebook, and Instagram.[11]

A related organization, the Authors Registry ("Registry"), has also provided counsel with the contact information for over twenty thousand authors and authors' estates, on a confidential basis, for use solely for contacting the authors, under subpoena. The Registry is a not-for-profit clearinghouse for payments to U.S.-

---

[11] The Authors Guild has posted the information at its accounts on Instagram - https://www.instagram.com/p/DNjYfSbta3N/?img_index=1; Bluesky - https://bsky.app/profile/authorsguild.org/post/3lwrvtul5vs2v; Threads - https://www.threads.com/@authorsguild/post/DNjXXW9tX-k?xmt=AQF0akvGF148-z6b8k0i4aOlUWEt36uNNLN68UrbZ3ZCsw; Facebook - https://www.facebook.com/AuthorsGuild/posts/pfbid02WWwQNDRHJuuezDRY2EUJ4EZ6LhCgZx4XstzW9kQaPSeZp4q7dSjGeiqq1yzT9pF8l; and LinkedIn - https://www.linkedin.com/feed/update/urn:li:activity:7363691619310559232/?actorCompanyId=5174496.

taxpaying authors and their beneficiaries, which annually distributes millions of dollars to many thousands of payees. The Registry regularly reaches up to 99% of payees it is tasked with locating. To date, the Registry has distributed over $47 million to authors of academic, nonfiction, fiction, and every other category of literature.  As with the publishers who will be directly notified as part of the Process, the Registry frequently works with authors' estates and knows who the payees are and how to contact them.  For any authors who may remain uncontacted, the Registry has agreed to help locate them at cost.

Publications that authors read are also assisting in notifying authors about the Class Action Website, including *Publishers Weekly, Publishers Lunch, Writer Beware*, a service of *amicus* SFWA, Jane Friedman's *The Bottom Line*, and others. The major publishers are also contacting their authors and authors' estates, as described in Plaintiffs' Motion to Approve Class Notice (ECF 317) at 7.

Accordingly, it will be the rare author who will not be made aware of this action through the multiple efforts being made, and those few can be located proactively by the collective licensing entities that regularly find authors to provide them with payments from overseas collective licensing royalties. In light of the massive scale of infringement at issue here, the alternative to a class action would be hundreds of thousands of individual cases which the courts would most certainly consolidate. That is not the more efficient option.

## **<u>CONCLUSION</u>**

For the foregoing reasons, and the reasons set forth in Plaintiffs-Respondents'

Memorandum of Law in opposition to the petition, the petition should be denied in

all respects.

Dated:  August 21, 2025

Respectfully submitted,

/*<u>Robert W. Clarida</u>*

Robert W. Clarida

James Ng

**REITLER KAILAS & ROSENBLATT LLP**

885 Third Avenue, 20th Floor

New York, NY 10022

Tel: (212) 209-3044

rclarida@reitlerlaw.com

jng@reitlerlaw.com

*Counsel for Amici Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 25-4843

I am the attorney or self-represented party.

**This brief contains** 3,468 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

⦿ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [        ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Robert W. Clarida  **Date** August 21, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                          *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

The undersigned, an attorney admitted to practice in this Court, certifies that on August 21, 2024, he caused a true and correct copy of the foregoing document to be served using the Court's electronic filing system, which will send electronic notification of such filing to all parties that have appeared in this action.

*/Robert W. Clarida*
Robert W. Clarida